SEALED

PAUL C. RAY, ESQ.
Nevada Bar No. 4365
GERARD DONDERO, ESQ.
Nevada Bar no. 13107
PAUL C. RAY, CHTD.
8670 West Cheyenne Avenue Suite 130
Las Vegas, NV 89129
Telephone: (702) 823-2292
Facsimile: (702) 823-2384
Email: paulcraylaw@gmail.com

Attorneys for Relator Cheryl Nolte

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA
*ex rel.*
Cheryl Nolte

Plaintiffs,

vs.

CLARK COUNTY, A POLITICAL SUBDIVISION OF THE STATE OF NEVADA; THE CLARK COUNTY DEPARTMENT OF AVIATION; AND MCCARRAN INTERNATIONAL AIRPORT,

Defendants

Case No.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT PLACE IN PRESS BOX
DO NOT ENTER ON PACER**

2:15-cv-01621-JCM-VCF

### FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

1. Cheryl Nolte (the"Relator") brings this action on behalf of the United States of America against defendants for treble damages and civil penalties arising from the defendants' false statements and false claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*. The violations arise out of false assurances and certifications in grant applications failing to

FILED ___ RECEIVED
___ ENTERED ___ SERVED ON
COUNSEL/PARTIES OF RECORD

AUG 24 2015

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

1  disclose numerous takings of valuable property without payment of just compensation and in
2  violation of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of
3  1970 Title 42 U.S.C. § 4601 et seq.

4      2. The relator has provided to the United States Attorney for the District of Nevada a
5  statement of substantially all related material and information related to the complaint. This
6  disclosure statement is supported by material evidence known to relator at her filing establishing
7  the existence of defendants' false claims. Because the statement includes attorney-client
8  communications and work product of relator's attorneys, and is being submitted to the Attorney
9  General and the United States Attorney in their capacity as potential co-counsel in the litigation,
10 the relator understand this disclosure to be confidential.

## JURISDICTION AND VENUE

12     3. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. This
13 Court has jurisdiction over this case pursuant to 31 U.C. § 3732(a) and 3730(b). This Court also
14 has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

15     4. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts
16 proscribed by 31 U.S.C. 3729 *et seq*. and complained of herein took place in this district, and is
17 also proper pursuant to 28 U.S.C. § 1391(b) and (c) because at all times material and relevant,
18 defendants transact and transacted business in this District. Venue is further proper because the
19 false assurances were made in Nevada, and the Defendants are located solely in Clark County,
20 Nevada.

## PARTIES

22     5. Relator Cheryl Nolte is a citizen of the United States and a resident of the State of
23 Arizona. From 1993 to the present Relator has been involved directly or indirectly by ownership
24 of general partnerships located in Nevada called CEH Properties, Ltd. ("CEH") and North
25 American Properties ("NAP"), both of which have been at various times during the entire period
26 of years from 1993 to the present in inverse condemnation litigation against or involving the
27 defendants.

28     6. Relator is an original source of this information to the United States. She has

direct and independent knowledge of the information on which the allegations are based and voluntarily provided the information to the Government before filing an action under the False Claims Act which is based on the information.

7. Defendant Clark County is a political subdivision of the State of Nevada, which enacted height restriction ordinances which effectuated takings of airspace property belonging to Relator's partnerships and other airspace property belonging to others.

8. Defendant Clark County Department of Aviation ("DOA") is an enterprise fund in the State of Nevada which enters into airport improvement grant agreements with the United States for the development of airports in Clark County, Nevada.

9. Defendant McCarran International Airport ("McCarran") is an airport operated by the DOA in Clark County Nevada which sought federal funds from the Federal Aviation Administration ("FAA") for development of its airport operations.

## FACTUAL ALLEGATIONS

10. At all relevant times Relator Cheryl Nolte held a percentage of her family's ownership of CEH, which from the late 1980's through the late 1990's owned property on the south Las Vegas Strip near Sunset Road and Las Vegas Boulevard where CEH was developing their family's dream project called the Vacation Village Hotel and Casino ("Vacation Village"), which was eventually sold in a bankruptcy reorganization in 2001. If Clark County would have paid just compensation for the airspace taken from the Vacation Village property at the time, they should not have had to lose their long-time investment in the property.

11. In 1990 Clark County enacted Ordinance 1221, which restricts construction heights of buildings on property located in certain areas or zones designated by Airspace Zoning Maps adopted by Ordinance 1221, including the parcel upon which the Vacation Village was located (the "Vacation Village property") so that airplanes flying at McCarran may use the airspace reserved on an approach surface sloping horizontally fifty feet from the runway for every one foot vertically (50:1).

12. On or about December 17, 1993 CEH filed a complaint against Clark

County and the DOA for, among other things, just compensation from takings of CEH's airspace by inverse condemnation in Case No. A328450 in the Eighth Judicial District Court, Clark County, Nevada.

13. On or about December 15, 1998 Case No. A328450 was removed as an adversary proceeding to the U.S. Bankruptcy Court, District of Nevada as Adversary Proceeding No. 98-2313, in which trial was held from April 4 through April 18, 2002 over five separate days, after which the bankruptcy court reserved its ruling.

14. The District Court for the District of Nevada withdrew the reference of the adversary proceeding to the district court as Case No. CV-S-05-0010-RCJ on January 4, 2005, and the district court entered on July 7, 2005 its final judgment of condemnation by Clark County of CEH's airspace.

15. Clark County appealed the judgment to the Ninth Circuit Court of Appeals, and CEH cross-appealed, which resulted in the affirmance in part as to the taking and reversal in part as to the amount of the award of just compensation of the district court's judgment of condemnation in the published case of *Vacation Village, Inc. v. Clark County*, 497 F.3d 902 (9th Cir. 2007), cert. denied, at 554 U.S. 917 (2008). The remand proceedings concluded in 2009 following increase of the award.

16. During the pendency of the nearly sixteen years of CEH's case, Clark County adopted Ordinance 1599, which further restricts construction heights in the area designated on a map adopted by Ordinance 1599 called the Aircraft Departure Critical Area ("ADCA") so that planes flying at McCarran may use that airspace sloping eighty feet horizontally for every one foot vertically (80:1) as well. Clark County, the DOA and McCarran also extended McCarran's north-south runway 1L/19R from 5,100 to 9,770 feet.

17. Also during the pendency of CEH's airspace takings case several other landowners whose airspace was reserved for flight by planes at McCarran filed inverse condemnation complaints for just compensation, and two other published cases, *McCarran Int'l Airport v. Sisolak*, 122 Nev. 645, 137 P.3d 1110 (2006), cert. denied, 549 U.S. 1206 (2007) (affirming that "the district court properly concluded that a county height restriction ordinance

effected a 'per se' taking of the airspace above private land that is located within the departure critical area of an airport approach zone"), and *Hsu v. County of Clark*, 123 Nev. 625, 173 P.3d 724 (2007), also concluded that Clark County Ordinances 1221 and 1599 constituted takings for which Clark County must pay just compensation.

18. Although Clark County had **never**:

    a. given any landowner advance notice of intent to take airspace restricted by these ordinances;

    b. obtained an appraisal for airspace taken by Ordinance 1221 or by Ordinance 1599;

    c. acquired any of the airspace by adverse possession;

    d. offered to pay any landowner of airspace taken for the appraised amount;

    e. filed a condemnation action under the procedure required by NRS 37.060; or

    f. paid any landowner just compensation under the Fifth Amendment or any amount for the airspace taken by Ordinance 1221 and by Ordinance 1599

without requiring the landowner to file an inverse condemnation complaint, Clark County began to assert the 15-year statute of limitations as a defense under White Pine Lumber v. City of Reno, 106 Nev. 778, 801 P.2d 1370 (1990), for inverse condemnation complaints of airspace takings by ordinance 1221 filed after 2005.

19. On July 6, 2009 NAP filed an inverse condemnation complaint in the Eighth Judicial District Court, Clark County, Nevada, Case No. A594649, for Clark County's taking of NAP's airspace by enactment of Ordinance 1221 and of Ordinance 1599 when NAP owned the property located in the ADCA, which is entirely included within the approach zone of Ordinance 1221. As was typical in these inverse condemnation airspace cases, Clark County denied that any taking occurred and required NAP to litigate to prove the taking and vigorously litigated against NAP's claim for just compensation.

20. Clark County also asserted a limitations defense against NAP's airspace takings

claim under Ordinance 1221 enacted in 1990, which the district court dismissed, while granting partial summary judgment because of NAP's ownership at the time of enactment of Ordinance 1599 in 1994.

21. Many months after failing to dispute NAP's ownership of the property at the time of taking, Clark County developed a theory near the close of discovery that perhaps NAP might not actually have owned the property at the time of enactment of Ordinance 1599 in 1994, ultimately persuading the district court to grant summary judgment against NAP for lack of standing by setting aside its prior partial summary judgment and to apply an adverse inference against NAP based on information presented to the court at an ex parte hearing, which the court did not allow NAP to attend, despite NAP's request to attend.

22. Notably, Clark County never indicated who the owner of the property was, if it was not NAP, showing that Clark County's dispute with paying NAP just compensation was not out of concern of double payment, but was rather out of intent to avoid any payment of just compensation for the airspace taken.

23. NAP argues in its appeal to the Supreme Court of Nevada, Case No. 61997 that NAP was the owner at the time of taking and that Clark County is mainly trying to avoid payment of just compensation. But whether or not NAP prevails in its appeal, Clark County has denied taking the airspace of the property within the ADCA, which the Supreme Court of Nevada held was a taking in *Sisolak*, and Clark County has not made any attempt to notify any landowner of the right to paid just compensation for the taking, even if Clark County were to prevail in the appeal.

24. Thus, to the current date of the filing of this complaint, Clark County keeps its perfect record intact of having **never**:

    a.    given any landowner advance notice of intent to take airspace restricted by these ordinances;

    b.    obtained an appraisal for airspace taken by Ordinance 1221 or by Ordinance 1599;

    c.    acquired any of the airspace by adverse possession;

   d. offered to pay any landowner of airspace taken for the appraised amount;

   e. filed a condemnation action under the procedure required by NRS 37.060; or

   f. paid any landowner just compensation under the Fifth Amendment or any amount for the airspace taken by Ordinance 1221 and by Ordinance 1599 without requiring the landowner to file an inverse condemnation complaint,

while spending more than $6 million litigating against landowners' inverse condemnation complaints for airspace takings from Ordinance 1221 and Ordinance 1599.

  25. Clark County's systematic, intentional strategy of requiring landowners to initiate inverse condemnation complaints rather than:

   a. providing advance notice of Clark County's intent to take the airspace which Clark County compelled the landowners to acquiesce to the physical invasion of their property held to be a taking under *Sisolak*, *Vacation Village*, and *Hsu*;

   b. without obtaining an appraisal;

   c. without offering to pay any landowner of airspace taken for the appraised amount; without filing a condemnation action under the required procedure of NRS Chapter 37, including but not limited to 37.060; and

   d. paying any landowner just compensation under the Fifth Amendment or any amount for the airspace taken by Ordinance 1221 and by Ordinance 1599 without requiring the landowner to file an inverse condemnation complaint

is a violation of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Relocation Act"), § 304(c), 42 U.S.C.A. § 4601 *et seq.*, including but not limited to § 4651 as to at least each property taken within the ADCA for each part of the Relocation Act violated, including but not limited to §4651, subsections (1) through (10).

  26. The airspace required by Clark County and the DOA to operate McCarran is integral to the entire airport operation, including all improvements. *Griggs v. Allegheny Cnty., Pa.*, 369 U.S. 84, 89-90, 82 S. Ct. 531, 534, 7 L. Ed. 2d 585 (1962). ("[A] county that designed and constructed a bridge would not have a usable facility unless it had at least an easement over

1  the land necessary for the approaches to the bridge." And consequently, "the glide path for the
2  [runway] is as necessary for the operation of the airport as is a surface right of way for operation
3  of a bridge, or as is the land for the operation of a dam." Id.)

4      27. Clark County, the DOA and McCarran intentionally made false certifications and
5  false assurance of compliance with the Relocation Act since taking airspace by enactment of
6  Ordinance 1599 each time they entered into a federal grant agreement with the United States
7  under the FAA's Airport Improvement Program, including but not limited to:

    a. Project 3-32-0012-57 for $15,233,688 on or about August 23, 2005;

    b. Project 3-32-0012-58 for $4,861,973 on or about August 30, 2005;

    c. Project 3-32-0012-59 for $7,000,000 on or about August 30, 2005;

    d. Project 3-32-0012-60 for $10,743,257 on or about August 14, 2006;

    e. Project 3-32-0012-61 for $1,077,286 on or about August 14, 2006;

    f. Project 3-32-0012-62 for $17,618,533 on or about July 25, 2007 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grant signed on July 27, 2007;

    g. Project 3-32-0012-63 for $2,124,233 on or about September 27, 2007 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grants signed on July 27, 2007;

    h. Project 3-32-0012-64 for $21,724,333 believed to be dated on or about June 26, 2008 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grant signed on July 27, 2007;

    i. Project 3-32-0012-65 for $3,500,000 believed to be dated on or about June 23, 2008 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grants signed on July 27, 2007;

    j. Project 3-32-0012-66 for an unknown amount believed to be dated between September 27, 2007 and September 17, 2008;

    k. Project 3-32-0012-67 for $$1,705,941 on or about September 17, 2008 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grants signed on July 27, 2007;

    l. Project 3-32-0012-68 for $2,074,974 on or about February 18, 2009 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grants signed on July 27, 2007;

    m. Project 3-32-0012-69 for $,223,932 on or about August 13, 2009 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grants signed on July 27, 2007;

    n. Project 3-32-0012-70 for $8,902,500 on or about September 24, 2009 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grant signed on July 27, 2007;

    o. Project 3-32-0012-71 for $70 000 on or about September 17, 2009 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grant signed on July 27, 2007;

    p. Project 3-32-0012-72 for $4,112,116 on or about September 24, 2009 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grant signed on July 27, 2007 ;

    q. Project 3-32-0012-73 for $11,632,903 on or about July 22, 2010 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grant signed on July 27, 2007;

    r. Project 3-32-0012-74 for $1,077,019 on or about August 26, 2010 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grant signed on July 27, 2007;

    s. Project 3-32-0012-75 for $2,812,500 on or about September 17, 2010 including the May 2007 "Terms and conditions of Accepting Airport Improvement Program Grant signed on July 27, 2007;

    t. Project 3-32-0012-76 for $8,371,313 in or about September 2011;

u.  Project 3-32-0012-77 for $10,489,054 in or about June 2011;

v.  Project 3-32-0012-78 for $8,464,336 in or about September 2011;

w.  Project 3-32-0012-79 for $468,087 in or about September 2012;

x.  Project 3-32-0012-80 for $17,816,857 in or about July 2012;

y.  Project 3-32-0012-81 for an unknown amount believed to be dated between September 2011 and October 2014;

z.  Project 3-32-0012-82 for $26,123,551 in or about September 2014; and

aa. All Project Numbers and AIP projects of Clark County, the DOA and McCarran in unknown amounts since Project 3-32-0012-82 to the present.

28. Clark County, the DOA and McCarran also submitted false certifications and assurances of compliance with the Relocation Act each time they submitted for approval by the FAA a Passenger Facility Charge ("PFC") application or amendment since taking airspace by enactment of Ordinance 1599, including but not limited to PFC Application No. 92-01-C-00-LAS and PFC Application No. 01 as previously amended, to impose, use or impose and use PFCs in the amount of $718,316,744 plus all allowed debt service, including but not limited to all PFC applications such as are referenced in a letter dated May 22, 2006 from Randal H. Walker, Director of Aviation for Clark County, the DOA and McCarran to Mr. Joe Rodriguez, Supervisor, Planning and Programming for the FAA and as to any and all subsequent PFC applications by Clark County, the DOA and McCarran.

29. In each of its grant agreements Clark County also certifies its assurance of compliance with Federal Aviation Administration ("FAA") Advisory Circular AC 150-5300-13 on Airport Design, which states at § 201(a):

> (1)  Existing and planned airspace required for safe and efficient aircraft operations should be protected by acquisition of a combination of zoning, easements, property interests, and other means. AC 150/5190-4, A Model Zoning Ordinance to Limit Height of Objects Around Airports, presents guidance for controlling the height of objects around airports.
>
> (2)  <u>All other existing and planned airport elements, including the following, should be on airport property:</u> (a) Object free areas; (b) Runway protection zones; (c) <u>Areas under the 14 CFR Part 77 Subpart C airport imaginary surfaces out to where the surfaces obtain a height of at least 35 feet (10m) above the primary</u>

surface; and (d) Areas, other then those which can be adequately controlled by zoning, easements, or other means to mitigate potential incompatible land uses.

(Emphasis added.) In providing such assurances in its grant agreements Clark County recognizes its obligation to acquire height restricted areas modeled after 14 CFR Part 77 up to a level of at least 35 feet.

30. In 1987 the FAA issued its Advisory Circular No. 150/5190-4A, "A Model Zoning Ordinance to Limit Height of Objects Around Airports" (the FAA's "Model Zoning Ordinance"). The FAA makes clear in Advisory Circular No. AC 150/5190-4A that the Model Zoning Ordinance is not to be used to effectuate takings, to avoid the requirement to pay just compensation for takings or to avoid the requirements of the Relocation Act for property acquisition procedures. Section 5, Use of Model Zoning Ordinance, states in pertinent part as follows:

> \* \* \*
>
> d. Any height limitations imposed by a zoning ordinance must be "reasonable," meaning that **the height limitations prescribed should not be so low at any point as to constitute a taking of property without compensations under local law.**
>
> \* \* \*
>
> f. Areas in the various zones where the height limitation is below the excepted height limit prescribed in the ordinance should be acquired to ensure the required protection. In the approach area, **the minimum acquisition** begins at the end of the primary surface defined in FAR Part 77, Section 77,25, and **extends** outward with the width of the approach surface defined in that section, **to a point where the approach surface slope reaches a height of 50 feet above the ground elevation** of the runway or terrain, whichever distance is the shorter.

(Emphasis added.) The Model Zoning Ordinance requires the airport operator to acquire at a minimum all of the area beneath the approach surface of the local land use zoning regulation for heights of construction from the end of the runway to the point where the approach surface reaches a height of 50 feet and to refrain from any taking without payment of just compensation, under local law, which in Nevada includes NRS 342.105 and the Relocation Act and compliance with NRS Chapter 37 on Eminent Domain, including the filing of a condemnation action where appraisal, offer and negotiation process have been attempted but have not succeeded in completing the acquisition process.

31. Clark County, the DOA and McCarran have recognized from 1990s to the present what can be done with the value of the airspace taken by enactment of Ordinance 1221 and Ordinance 1599 as follows:

    a. Clark County included as Appendix A to its 1994 Staff Report in support of Ordinance 1599 a Capacity Enhancement Plan, which valued Clark County's annual delay cost savings at $632 million over the "Do Nothing" scenario;

    b. In its 2007 certiorari petition to the Supreme Court in the Vacation Village case, Clark County, appearing as the owner and operator of McCarran, argued that the Court should grant certiorari because the takings rulings implicated an amount exceeding "$10 *billion*" (italics in original);

    c. Clark County advertised in 2011 that it built a $3 billion Terminal 3 project from McCarran's revenue without costing the taxpayers a cent;

    d. Clark County set aside reserves of $700 million for airspace takings claims; and

    e. In 2015 McCarran posted a neon sign in the first, most heavily traveled baggage area, stating, "AIRPORTS MEAN BUSINESS. McCarran International Airport contributes nearly $30 *billion* a year to the local economy." (Italics in original.)

32. Clark County, the DOA and McCarran had actual knowledge or were in reckless disregard to the truth of the fact that their certifications and assurances of compliance with the Relocation Act, AC 150-5300-13 and AC 5190-4A were all false.

///

## COUNT 1

**False Certifications of Compliance With the Relocation Act, AC 150-5300-13, AC 5190-4A To Obtain Grant Funding**

33. Relator Nolte re-alleges and incorporates the allegations of the previous

paragraphs as if fully set forth herein.

34. Defendants have knowingly presented false or fraudulent claims for payment or approval and made, used or caused to be used, false records or statements material to false or fraudulent claims in violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq., through their false certifications and assurances of compliance with the Relocation Act, AC 150-5300-13 and AC 5190-4A.

35. Clark County, the DOA and McCarran concealed their knowledge or their reckless disregard for the truth of their false certifications and assurances in order to obtain grant funding they would not otherwise have been able to obtain because of the Relocation Act's requirement of appraising property to be taken, offering the fully appraised value and refraining from requiring the landowners whose airspace was taken by Ordinance 1599 to file an inverse condemnation complaint to receive just compensation for property taken.

36. This concealment was knowingly made as Clark County, the DOA and McCarran went forward from the enactment of Ordinance 1599 in 1994 through the present, never giving advance notice of the taking of airspace; never obtaining an appraisal for airspace taken or to be taken; never offering appraised value to purchase airspace taken; never paying any landowner for airspace taken without requiring each landowner to be paid to first file an inverse condemnation complaint, which Clark county, the DOA and McCarran in each inverse condemnation case would then vigorously litigate.

37. This course of conduct violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*

38. The U.S. Government, unaware of the falsity of the claims and/or statements, and in reliance on the accuracy thereof, awarded grants to Clark County for the DOA and McCarran in amounts totaling at least some $173,000,000 plus additional amounts awarded in other grants from 2005 to the present, and the U.S. Government was damaged in at least these amounts.

## COUNT 2

### Use of False Statements Material to False or Fraudulent Claims To Obtain Grant Funding

39. Relator Nolte re-alleges and incorporates the allegations of the previous

1 paragraphs as if fully set forth herein.

2     40. Defendants knowingly and falsely used false statements of compliance with the Relocation Act, AC 150-5300-13 and AC 5190-4A.

4     41. Defendants made these misrepresentations to obtain grant funding to which they otherwise would not have been entitled.

6     42. This course of conduct violated the False Claims Act, 31 U.S.C. § 3729 et seq.

7     43. The U.S. Government, unaware of the falsity of the defendants' statements in the certifications and assurances, and in reliance on the accuracy thereof, was damaged in at least the amounts of the grant funding paid through these grant agreements plus additional amounts awarded in other grants from 2005 to the present.

## COUNT 3

**False Certifications of Compliance With the Relocation Act, AC 150-5300-13, AC 5190-4A To Obtain Approval of PFC Applications**

44. Relator Nolte re-alleges and incorporates the allegations of the previous paragraphs as if fully set forth herein.

45. Defendants have knowingly presented false or fraudulent claims for payment or approval and made, used or caused to be used, false records or statements material to false or fraudulent claims in violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq., through their false certifications and assurances of compliance with the Relocation Act, AC 150-5300-13 and AC 5190-4A.

46. Clark County, the DOA and McCarran concealed their knowledge or their reckless disregard for the truth of their false certifications and assurances in order to obtain FAA approval of PFC applications they would not otherwise have been able to obtain because of the Relocation Act's requirement of appraising property to be taken, offering the fully appraised value and refraining from requiring the landowners whose airspace was taken by Ordinance 1599 to file an inverse condemnation complaint to receive just compensation for property taken.

47. This concealment was knowingly made as Clark County, the DOA and McCarran

1 went forward from the enactment of Ordinance 1599 in 1994 through the present, by the
2 defendants never giving advance notice of the taking of airspace; never obtaining an appraisal for
3 airspace taken or to be taken; never offering appraised value to purchase airspace taken; never
4 paying any landowner for airspace taken without requiring each landowner to be paid to first file
5 an inverse condemnation complaint, which Clark county, the DOA and McCarran in each
6 inverse condemnation case would then vigorously litigate.

7    48. This course of conduct violated the False Claims Act, 31 U.S.C. § 3729 et seq.

8    49. The U.S. Government, unaware of the falsity of the claims and/or statements, and
9 in reliance on the accuracy thereof, approved PFC applications by Clark County for the DOA
10 and McCarran in amounts totaling at least some $718,316,744 and allowed debt service plus
11 additional amounts approved in other PFC applications from 2005 to the present, and the U.S.
12 Government was damaged in at least these amounts.

### COUNT 4

**Use of False Statements Material to False or Fraudulent Claims To Obtain Approval of PFC Applications**

50. Relator Nolte re-alleges and incorporates the allegations of the previous paragraphs as if fully set forth herein.

51. Defendants knowingly and falsely used false statements of compliance with the Relocation Act, AC 150-5300-13 and AC 5190-4A.

52. Defendants made these misrepresentations to obtain approval of PFC applications to which they otherwise would not have been entitled.

53. This course of conduct violated the False Claims Act, 31 U.S.C. § 3729 et seq.

54. The U.S. Government, unaware of the falsity of the defendants' statements in the certifications and assurances, and in reliance on the accuracy thereof, was damaged in at least the amounts of the approved PFC applications totaling $718,316,744 and debt service allowed plus additional amounts awarded in other PFC applications from 2005 to the present.

WHEREFORE, Relator Nolte respectfully requests this Court to enter judgment against defendants as follows:

(a) That the U.S. be awarded damages I the amount of three times the damages sustained by the U.S. because of the false claims and fraud alleged within this Complaint, as the Civil False claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b) That civil penalties of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 fr each and every false claim that defendants presented to the U.S.;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the relator necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

(e) That the relator be awarded the maximum amount allowed to her pursuant the False Claims Act; and

(f) That this Court award such other relief as is just and equitable.

DATED this 24th day of August, 2015.

PAUL C. RAY, CHTD.

*/s/ Paul C. Ray*

PAUL C. RAY, ESQ.
Nevada Bar No. 4365
GERARD DONDERO
Nevada Bar No. 13107
8670 West Cheyenne Avenue Suite 130
Las Vegas, NV  89129
Telephone:  (702) 823-2292
Facsimile:   (702) 823-2384
Email: paulcraylaw@gmail.com
Attorneys for Relator Cheryl D. Nolte